# SHER TREMONTE LLP

March 5, 2019

**BY ECF**

The Honorable Pamela K. Chen
United States District Judge
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:    *United States v. Brayan Jimenez*, 15-CR-252 (PKC)

Dear Judge Chen:

      We represent Brayan Jimenez in the above-captioned case. We write in response to the restitution claims submitted by the Confederation of North, Central America and Caribbean Association Football ("CONCACAF") on behalf of itself and purportedly on behalf of one of its member federations, the National Football Federation of Guatemala ("FENAFUTG"). Dkt. 1207.

      CONCACAF argues that restitution should be imposed in three respects: (1) restitution to FENAFUTG in the amount of $20,000 in connection with Mr. Jimenez's negotiation of friendly matches; (2) restitution to CONCACAF in the amount of $1,478,204.70 for its attorneys' fees and expenses incurred while assisting the government with its investigation and prosecution; and (3) restitution to CONCACAF in the amount of $39,680 for its attorneys fees and expenses incurred while preparing its restitution request.

      We oppose these claims. First, even assuming CONCACAF can bring claims on behalf of FENAFUTG, the claim fails because CONCACAF cannot establish a direct correlation between Mr. Jimenez's anticipated ill-gotten gains and FENAFUTG's loss in connection with the organization of friendly matches. With respect to CONCACAF's requests, its attorneys' fees associated with the government investigation and preparation of the restitution claims were not reasonably foreseeable or necessary. We also incorporate arguments addressed by defendants Napout, Marin, Li, and Salguero, to the extent they apply to restitution claims against Mr. Jimenez.

      **I.**    **FENAFUTG**

            A.  <u>CONCACAF Lacks Authority to Act on Behalf of FENAFUTG</u>

"Only a 'victim' (or the victim's estate) is entitled to restitution" under the Mandatory Victims Restitution Act ("MVRA"). *United States v. Maynard*, 743 F.3d 374,

March 5, 2019
Page 2

378 (2d Cir .2014). CONCACAF does not have authority to act as the representative of its member federation, FENAFUTG. *See* Dkt. 1207 at 1 (admitting that it has "not been able to confirm that it has formal authority to act" on behalf of FENAFUTG). Because CONCACAF lacks authority to act on behalf of FENAFUTG, it should not be permitted to make restitution claims on their behalf.

> B. There Is No Correlation Between Mr. Jimenez's Anticipated Ill-Gotten Gains In Connection with the "Friendly" Matches and Loss to FENAFUTG

As the president of FENAFUTG, Mr. Jimenez had influence over whether and with whom the Guatemalan soccer team would play friendly matches. Mr. Jimenez was offered money for scheduling the Guatemalan team to play friendly matches. He agreed to receive $5,000 per game for each match authorized. While approximately four matches were played, resulting in a contemplated $20,000 payment, ultimately Mr. Jimenez only ever received $5,000 for authorizing friendly matches.

CONCACAF argues that FENAFUTG lost at least $20,000 in connection with this conduct because "it indicates that Tordin and his co-conspirator considered the contract to be worth at least $20,000 more than they paid." *See* Dkt. 1207 at 2. But CONCACAF cannot establish that Mr. Jimenez's agreement to accept $20,000 caused *any* loss to FENAFUTG.

As the Court is aware, "a sentencing court ordering restitution under the MVRA may not substitute a defendant's ill-gotten gains for the victim's actual loss" unless "there is a direct correlation between gain and loss, such that the defendant's gain can act as a *measure* of—as opposed to a *substitute* for—the victim's loss." *United States v. Zangari*, 677 F.3d 86, 92-93 (2d Cir. 2012) (emphasis in original). FENAFUTG may not recover the amount of Mr. Jimenez's (anticipated) ill-gotten gains because there is nothing to suggest that FENAFUTG would have received that amount absent the criminal conduct.

As an initial matter, CONCACAF's argument that the "contract in an honest transaction" would have been "worth at least $20,000" assumes that such a contract or honest transaction would have existed in the first place. It has failed to make that showing. If, absent any criminal conduct, FENAFUTG would not have been paid in connection with a friendly match, there is no reason to conclude that Mr. Jimenez's conduct caused FENAFUTG any loss.

Second, CONCACAF has failed to explain what portion, if any, of the kickbacks that were paid (or meant to be paid) to Mr. Jimenez went to authorizing the matches in the first place versus authorizing the matches at less than fair market value. *See United States v. Finazzo*, 850 F.3d 94, 119 & n.25 (2d Cir. 2017). As the Court explained in denying CONMEBOL's request for restitution for lost revenue, it is incumbent on the government to distinguish between kickbacks solely made to *secure* a contract and kickbacks reflecting an *inflated price* for that contract. Dkt. 1084 at 20. Even assuming

March 5, 2019
Page 3

there was a "contract," without some basis to explain what portion of the kickbacks reflected securing the contracts at less than fair market value, restitution is inappropriate. *See* Dkt. 1084 at 22 ("While the Court understands the potential difficulty of establishing fair market values for these tournaments, given the rampant corruption that seemingly infected all of the comparable tournament contracts, the Court still may not 'merely assume' that the entire amount of the many kickbacks that were paid were solely for the purpose of securing lower contract prices and, therefore, are an appropriate measure of lost revenue.").[1]

The Court has rejected similar restitution claims on this basis. For instance, CONMEBOL requested $85,400,000 in bribes paid to Defendants Marin and Napout as a measure of its lost revenue for tournaments on the ground that Marin and Napout failed to create a legitimate tender process to ensure that CONMEBOL secured the fair market value for the marketing and media rights for those events. Dkt. 1084 at 18-19. The Court correctly rejected this request because CONMEBOL failed to present evidence "to explain what portion of the bribes that were paid to Defendants went to securing the contracts in the first place versus getting the contracts at less than fair market value." *Id.* at 21.

CONCACAF cites the Court's order requiring Defendant Costas Takkas to pay the Caribbean Football Union ("CFU") $3 million in restitution even though only $1.25 million was ultimately paid.[2] Dkt. 1207 at 2. That bribe, however, involved an actual contract -- the payment for certain media rights to World Cup qualifying matches. The Court did not have an opportunity to consider or opine on whether restitution was appropriate under *Finazzo*.

Because there is no proof that there was a loss to FENAFUTG, or, alternatively, that any loss was "a *necessary* consequence of all the kickbacks [Mr. Jimenez] received," *Finazzo*, 850 F.3d 94, 118 (2d Cir. 2017) (emphasis in original), the restitution request should be denied.

---

[1] Moreover, the fact that Mr. Jimenez was ultimately *not paid* for the majority of these friendly matches suggests that the friendly matches were in fact worth far less than what Mr. Jimenez agreed to receive.

[2] Takkas's restitution obligations were subsequently declared satisfied in full in light of US Imagina, LLC's $3 million restitution payment to CFU to compensate CFU for the losses it sustained as a result of the same scheme. Dkt. 1141.

March 5, 2019
Page 4

## II.     CONCACAF

### A. CONCACAF's Attorneys' Fees and Investigative Costs Were Not Proximately Caused by Mr. Jimenez's Conduct or Conduct Reasonably Foreseeable to Him

CONCACAF seeks restitution for $1,478,204.70 in attorneys' fees and expenses it incurred assisting the government with the investigation and prosecution of this case. Considering only Mr. Jimenez's own "criminal conduct during the course of the . . . conspiracy," 18 U.S.C. § 3663A(a)(2), those actions did not proximately cause the fees requested by CONCACAF. Based on his limited criminal dealings with Media World and FENAFUTG, it was not reasonably foreseeable to Mr. Jimenez that the United States government would begin a wide-ranging investigation and require CONCACAF to participate so extensively as to expend $1,478,204.70 in legal fees.

A "victim" under the MVRA is "a person *directly and proximately harmed* as a result of the commission of an offense for which restitution may be ordered including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern." 18 U.S.C. § 3663A(a)(2) (emphasis added). This Court has reasoned that a participant in a conspiracy may be ordered to pay restitution caused by the reasonably foreseeable acts of his coconspirators. *See United States v. Boyd*, 222 F.3d 47, 50 (2d Cir. 2000).[3]

Section 3663A(b)(4) allows for the reimbursement "for lost income and necessary child care, transportation, and other expenses incurred during participation in the investigation or prosecution of the offense or attendance at proceedings related to the

---

[3] We respectfully disagree with the proposition that a participant in a conspiracy must be ordered to pay restitution caused by the reasonably foreseeable acts of his coconspirators. In *United States v. Boyd*, the defendant was convicted of six counts of substantive mail and wire fraud and acquitted of one count of conspiracy. Exercising plain error review, the court affirmed a restitution award imposing joint and several liability for "all convicted co-conspirators in respect of damage suffered by all victims of a conspiracy, regardless of the facts underlying counts of conviction in individual prosecutions." 222 F.3d 47, 50-51 (2d Cir. 2000) (per curiam). However, "[a]s a general matter, restitution is permitted 'only for an amount of loss caused by the specific conduct forming the basis for the offense of conviction.'" *United States v. Gushlak*, 728 F.3d 184, 195 n.7 (2d Cir. 2013) (noting that *Boyd* was decided on plain error review). The Second Circuit has held that § 3663A(a)(2) "reflects an important limiting principle for restitution awards—namely, that Congress has 'authorize[d] an award of restitution only for the loss caused by the specific conduct that is the basis of the offense of conviction.'" *United States v. Vilar*, 729 F.3d 62, 97 (2d Cir. 2013) (citing *Hughey v. United States*, 495 U.S. 411, 413 (1990)). "[R]estitution is not permitted for loss caused by 'relevant conduct' even though such conduct may be properly included in offense level calculation under the Sentencing Guidelines." *Id.* (internal citations omitted).
    It is also inconsistent with the text of § 3663A itself, which defines "victim" to include, "in the case of an offense that involves as an element a . . . conspiracy . . . any person *directly harmed by the defendant's criminal conduct* in the course of the . . . conspiracy." Importing *Pinkerton* liability to the restitution context renders this language entirely superfluous.

offense." However, the Supreme Court recently held that this language "does not cover the costs of a private investigation that the victim chooses on its own to conduct." *Lagos v. United States*, 138 S. Ct. 1684, 1690 (2018).

Reading these sections together, the Second Circuit has stated that it views "the requirement that the harm have been 'proximately' caused as a reflection of Congress's interest in maintaining efficiency in the sentencing process, as the term 'proximate case' is sometimes used to label generically the judicial tools used to limit a person's responsibility for the consequences of that person's own acts. At bottom, the notion of proximate cause reflects ideas of what justice demands, or of *what is administratively possible and convenient*." *United States v. Reifler*, 446 F.3d 65, 135 (2d Cir. 2006) (internal quotations marks omitted) (emphasis in original); *see also United States v. Thompson*, 792 F.3d 273, 277 (2d Cir. 2015) ("In restricting its definition of 'victim' to persons proximately harmed by the defendant's acts, the MVRA aims to limit restitution to those harms that 'ha[ve] a sufficiently close connection to the conduct at issue.'") (quoting *Robers v. United States*, 572 U.S. 639, 645 (2014))).

Thus, the question is, first, whether the conduct of other named co-conspirators unknown to Mr. Jimenez was reasonably foreseeable to Mr. Jimenez, and second, whether Mr. Jimenez's conduct and the reasonably foreseeable conduct of his co-conspirators proximately caused CONCACAF to spend $1,478,204.70 assisting the United States with its investigation and prosecution. Importantly, the question is *not* whether it was reasonably foreseeable that CONCACAF would conduct its own investigation. This is because expenses paid toward CONCACAF's internal investigation are not compensable harms under § 3663A(b)(4). *See Lagos v. United States*, 138 S. Ct. 1684 (2018).

Both questions should be answered in the negative. The conduct attributable to Mr. Jimenez is limited in scope. Mr. Jimenez's conduct involved only: (1) his agreement to receive kickbacks in exchange for the media rights to certain World Cup qualifying matches; and (2) his agreement to receive kickbacks in exchange for authorizing friendly games. He met and conspired with executives from Media World and certain other FENAFUTG officials. There is nothing in the record to suggest that the entire scope of the criminal conduct alleged in the indictment was reasonably foreseeable to Mr. Jimenez. Unlike defendant Napout, who "knew that the agreement of all of the soccer officials was necessary for the bribery schemes to succeed" and therefore could reasonably foresee the "wide-ranging bribery schemes," Dkt. 1084 at 16 n.13, Mr. Jimenez had no such knowledge. *Cf United States v. Smith*, 513 F. App'x 43, 44 (2d Cir. 2013) (summary order) (holding defendant responsible for co-conspirators' behavior because, during plea allocution, defendant admitted that she could foresee that the credit card numbers she stole would be used by coconspirators in unauthorized manner).

Moreover, contrary to CONCACAF's claim that Mr. Jimenez is liable for the entire scope of the conspiracy simply "[b]ecause [he] has been convicted of the RICO Conspiracy," Dkt. 1207 at 2, Mr. Jimenez is responsible only to those "directly harmed

by [his] criminal conduct in the course of the . . . conspiracy." 18 U.S.C. § 3663A(a)(2). His plea to conspiracy does not change that. In order to be guilty of RICO conspiracy, Mr. Jimenez need "possess[] knowledge of only the general contours of the conspiracy" *United States v. Zichettello*, 208 F.3d 72, 99-100 (2d Cir. 2000). He need not have known about any particular criminal acts to be guilty of conspiracy. *See id.*

Finally, CONCACAF's theory of compensable harm sweeps too broadly. CONCACAF claims to be harmed by Mr. Jimenez *only* to the extent it participated in the government investigation and prosecution. There is no separate financial injury apart from this claimed harm. Endorsing a claim of restitution on this record would mean that any cooperating witness or entity that spends money in assisting the government in a prosecution could claim to be a "victim" entitled to restitution. Under CONCACAF's theory, any criminal defendant should be responsible for the remote possibility that a person or entity providing assistance to the government will spend millions of dollars doing so. This stretches the bounds of proximate cause beyond all reasonable limits and implicates the excessive fines clause of the Eighth Amendment.[4] *See Paroline v. United States*, 572 U.S. 434, 455-56 (2014).

### B. CONCACAF Fails to Distinguish Between Attorneys' Fees That Were "Necessary" Expenses and Attorneys' Fees Expended to Protect Itself from Liability

The expenses sought must also be "necessary" to the government's prosecution and investigation. 18 U.S.C. § 3663A(b)(4). Victim expenses are only recoverable insofar as they were incurred "to advance the investigation or prosecution of the offense." *Maynard*, 743 F.3d at 381. On the other hand, legal expenses paid to advance one's own interest are not compensable under *Lagos*. *See* Dkt. 1084 at 7-8.

CONCACAF's retention of expensive legal representation over the course of several years was not necessary to CONCACAF's assistance to the government. Providing documents and information to prosecutors does not always require legal assistance. Attorneys only become necessary to the extent CONCACAF was motivated to limit its own criminal liability, which is not compensable under *Lagos v. United States*. *See* Dkt. 1084 at 7-8. In short, the Court has not fully considered whether CONCACAF was exposed to civil or criminal liability and the extent to which attorneys' fees were in part directed to minimize its own liability.[5]

---

[4] Of note, CONCACAF and the government declined to pursue similar restitution claims against defendants similarly situated to Mr. Jimenez. For instance, CONCACAF did not make restitution claims against Mr. Trujillo for attorneys' fees. Nor did CONCACAF or the government seek to hold US Imagina accountable for CONCACAF's attorneys' fees as part of its settlement. This would suggest that CONCACAF and the government rightly concluded that the attorneys' fees were not a direct and proximate result of Mr. Trujillo and US Imagina's criminal conduct. There is no reason to hold Mr. Jimenez to a different standard.

[5] The mere difference of timing – that FIFA approached the government before a request for assistance was made – is not conclusive of whether CONCACAF acted to minimize its own liability.

March 5, 2019
Page 7

### C. CONCACAF Restitution Fees

CONCACAF also seeks fees associated with its preparation of its restitution request, including fees incurred in assembling, reviewing, and submitting billing records to support its attorneys' fees, totaling $49,600. Applying the 20% discount the Court applied in the Marin/Napout case, at 18, CONCACAF asserts that Jimenez should be held jointly and severally liable for $39,680.

For the same reasons stated above, we object to the fees incurred in connection with the restitution request.

### III. Sixth and Seventh Amendments

We also respectfully object to the imposition of any amount of restitution not found by a jury beyond a reasonable doubt, as it violates Mr. Jimenez's rights under the Sixth and Seventh Amendments. *See United States v. Booker*, 543 U.S. 220 (2005); *Apprendi v. New Jersey*, 530 U.S. 466 (2000); *see also Hester v. United States*, -- S. Ct. --, 2019 WL 113622 (Jan. 7, 2019) (Gorsuch, *J.* dissenting in the denial of certiorari).

### IV. Payment Schedule

In determining the manner in which, and the schedule according to which, restitution is to be paid, the Court should consider Mr. Jimenez's limited financial resources and outstanding financial obligations to the government. *See* 18 U.S.C. § 3664(f).

As the Court is aware, Mr. Jimenez's financial resources are limited. His does not have significant assets and has been supported by his wife over the past several years while the prosecution of this case has been ongoing. Mr. Jimenez plans to restart his modest dental career and he does not anticipate making a significant salary. In addition, Mr. Jimenez will be required to help support his large family, including the care of his disabled son. On top of these expenses, Mr. Jimenez will be required to contribute 10% of his income toward his forfeiture obligations.

The Court should consider Mr. Jimenez's financial condition and the fact that he will continue paying forfeiture payments – all of which may be transferred toward restitution in the discretion of the Attorney General. *See* 18 U.S.C. § 1963(g)(1).

Should the Court determine that restitution is appropriate, we request that the payment schedule begin after Mr. Jimenez has completed his forfeiture payments. Given the possibility of remission or restoration of his forfeiture payments toward restitution

March 5, 2019
Page 8

and Mr. Jimenez's inability to pay more than 10% of his income, the Court should avoid scheduling additional payments on top of the 10% he will be paying.[6]

    We appreciate the Court's consideration.

                                   Very truly yours,

                                   /s/
                                   Justine Harris
                                   Heather Han
                                   Anna Estevao

---

[6] Pending before the Court is a motion to amend the Judgment to reflect the understanding reached at sentencing that Mr. Jimenez fulfill his forfeiture obligations on a schedule, to begin six months after his sentencing date, of monthly payments equal to 10% of his gross salary. Dkt. 1199.