UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------x
UNITED STATES OF AMERICA,

                 - against -

BRAYAN JIMÉNEZ,

                 Defendant.

--------------------------------------------------------x

**MEMORANDUM & ORDER**
15-CR-252 (PKC) (RML)

PAMELA K. CHEN, United States District Judge:

On July 29, 2016, Defendant Brayan Jiménez ("Defendant" or "Jiménez") entered a guilty plea before the Honorable Robert M. Levy, United States Magistrate Judge, to one count of racketeering conspiracy (Count 1) and one count of conspiracy to commit wire fraud (Count 42). (*See* Dkt. 390.)  The Honorable Raymond J. Dearie accepted Defendant's guilty plea on August 3, 2016.  (*See* Dkt. 400.)  Defendant was sentenced on February 5, 2019, though the Court deferred ruling on restitution pending further briefing and submissions by the government, Defendant, and putative victims.  (*See* February 5, 2019 Minute Entry.)  The Court held oral argument regarding restitution on April 4, 2019.  (*See* April 4, 2019 Minute Entry.)

Before the Court are the restitution requests of the government and putative victim the Confederation of North, Central America and Caribbean Association Football ("CONCACAF"), which submits its restitution request on behalf of itself and one of its member federations, the National Football Federation of Guatemala ("FENAFUTG").  Pursuant to the Mandatory Victims Restitution Act ("MVRA"), 18 U.S.C. § 3663A, the government and CONCACAF seek a restitution order awarding: (1) attorneys' fees and investigative expenses incurred by CONCACAF in responding to government requests during the investigation and prosecution of Defendant and his co-Defendants; (2) attorneys' fees and investigative expenses incurred by CONCACAF in preparing and litigating its restitution requests as to Defendant and his co-Defendants; and (3)

disgorgement of bribes that Defendant agreed to receive in connection with Defendant's authorization, in his role as President of FENAFUTG, of friendly matches involving the Guatemalan national men's soccer team.

## DISCUSSION[1]

### I.      Which Parties Qualify as Victims Under the MVRA

The Court finds that CONCACAF and FENAFUTG[2] qualify as victims under the MVRA because each soccer organization suffered harm as a direct result of the offenses of which Jiménez was convicted.  18 U.S.C. § 3663A(a)(2) (defining "victim" as "a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered").

### II.     CONCACAF

#### A.      CONCACAF – Attorneys' Fees and Investigative Expenses

First, CONCACAF requests that Defendant be ordered to pay restitution in the amount of $1,478,204.70, which represents the attorneys' fees and investigative expenses that CONCACAF incurred in assisting the government with the investigation and prosecution of this case.  (Dkt. 1207, at 2–3.)  The government supports CONCACAF's request.  (Dkt. 1212, at 2; Dkt. 1221, at

---

[1] The Court assumes the parties' familiarity with the relevant facts and procedural history in this case and refers to them only to the extent necessary for the Court's analysis.  In addition, the Court relies on, and incorporates by reference, its November 20, 2018 and February 24, 2019 decisions regarding restitution with respect to Defendants Juan Ángel Napout, José Maria Marin, Eduardo Li, and Rafael Salguero.  (*See* November 20, 2018 Marin & Napout Restitution Order ("Marin & Napout Order"), Dkt. 1084; February 24, 2019 Li & Salguero Restitution Order ("Li & Salguero Order"), Dkt. 1209.)  The Court also relies on the same legal standards set forth in those prior decisions and does not recite them again in this Order.  (*See* Marin & Napout Order, Dkt. 1084, at 3–4; Li & Salguero Order, Dkt. 1209, at 2–3.)

[2] The Court notes that FENAFUTG is a victim despite the Court's finding, *infra*, that the government and CONCACAF have not proved the amount of FENEFUTG's losses with respect to the friendly matches.  At a minimum, Jiménez has pleaded guilty to defrauding FENAFUTG and depriving it of its right to Jiménez's honest services, thus causing harm to the organization.

2–3.) Defendant opposes CONCACAF's request on the basis that his conduct did not proximately cause CONCACAF's losses and that CONCACAF is requesting restitution for attorneys' fees that it incurred to protect itself from liability. (Dkt. 1213, at 4–6.)

The Court rejects Defendant's argument. Defendant has pleaded guilty to participating in the racketeering conspiracy charged in Count I of the Superseding Indictment. (*See* Dkt. 400.) Thus, like his co-conspirators, Jiménez is responsible for all reasonably foreseeable losses incurred by victims as a result of the conspiracy. These reasonably foreseeable losses include the fees and costs incurred by CONCACAF in assisting the government, at its specific request, with the investigation and prosecution of that conspiracy. (*See* Marin & Napout Order, Dkt. 1084, at 16 n.13 (citing *United States v. Smith*, 513 F. App'x 43, 45 (2d Cir. 2013)); Li & Salguero Order, Dkt. 1209, at 5 & n.4.) Therefore, Defendant is jointly and severally liable with all convicted co-conspirators for $1,478,204.70 in restitution for the attorneys' fees and investigative expenses incurred by CONCACAF to respond to specific government requests.

B.     **CONCACAF – Attorneys' Fees and Expenses Relating to Its Restitution Requests**

CONCACAF also requests restitution in the amount of $39,680, which reflects the attorneys' fees and related expenses that CONCACAF has incurred in preparing its restitution requests and participating in restitution proceedings relating to Defendant and his co-conspirators. (Dkt. 1207, at 2–3.) This amount is the same as the restitution liability that the Court imposed on Napout, Marin, Li, and Salguero for CONCACAF's restitution-related attorneys' fees and expenses, and it reflects a 20% discount to offset the excessive hourly rates charged by CONCACAF's counsel. The government supports CONCACAF's request. (Dkt. 1212, at 2; Dkt. 1221, at 2–3.) Jiménez objects to this request for the same reasons that he objects to the restitution requested by CONCACAF in connection with its investigative expenses. (Dkt. 1213, at 7.)

3

The Court finds that CONCACAF has sufficiently justified its fees and expenses relating to its request for restitution as to Jiménez and his co-conspirators.  (*See* Marin & Napout Order, Dkt. 1084, at 15–18; Li & Salguero Order, Dkt. 1209, at 6.)  Therefore, Defendant is jointly and severally liable with all convicted co-conspirators to CONCACAF for $39,680 in attorneys' fees and expenses relating to CONCACAF's restitution requests.

III.    **FENAFUTG**

On behalf of its constituent federation FENAFUTG, CONCACAF requests an order of restitution to FENAFUTG in the amount of $20,000.  (Dkt. 1207, at 1–2.)  This amount reflects lost revenue to FENAFUTG that resulted from Jiménez's agreement to accept $20,000 in bribes from Fabio Tordin and an unnamed co-conspirator in exchange for authorizing friendly matches between the Guatemalan men's national team and the teams of other FIFA member associations ("Friendly Matches") in 2014 and 2015.[3]  (Indictment ("Ind."), Dkt. 102 ¶¶ 277–278, 287–289.)  Though Defendant appears to have only received $5,000 in connection with the authorization of the Friendly Matches, *see* February 5, 2019 Jiménez Sentencing Transcript, at 5–6, CONCACAF argues that the full amount of the promised bribes should be paid as restitution because "it is reasonable to assume that FENAFUTG's losses were *at least* $20,000."  (Dkt. 1207, at 2 (emphasis in original).)  CONCACAF argues that the amount of the promised bribes is an appropriate measure of loss because the bribes demonstrate that Tordin and his co-conspirator were willing to pay $20,000 more than they ultimately paid in order to induce FENAFUTG to contract with their

---

[3] Defendant Jiménez was also involved in receiving more than $400,000 in bribes from Media World, LLC, at which Tordin worked as an executive, in exchange for selling FENAFUTG's media and marketing rights to the 2018 and 2022 World Cup qualifier matches. (Ind., Dkt. 102 ¶¶ 263–267.)  Those bribes are not at issue in this Order, as US Imagina, LLC has already fully compensated FENAFUTG for the losses it suffered as a result of the World Cup qualifiers scheme.  (*See* Dkt. 1207, at 1 n.1; *see also United States v. US Imagina, LLC*, No. 18-CR-311, Dkt. 12, at 18, 32.)

business venture to participate in and promote the Friendly Matches.  (*Id.*)  The government

supports CONCACAF's request.  (Dkt. 1212, at 2; Dkt. 1221, at 1–2.)  Defendant opposes

CONCACAF's request on two grounds: (1) that CONCACAF has no authority to request

restitution on behalf of FENAFUTG; and (2) that the government has not shown a sufficient

correlation between Defendant's anticipated ill-gotten gains and the amount of revenue lost by

FENAFUTG.  (Dkt. 1213, at 1–3.)

### A.      CONCACAF's Authority to Request Restitution on Behalf of FENAFUTG

As an initial matter, Defendant argues that "[b]ecause CONCACAF lacks authority to act

on behalf of FENAFUTG, it should not be permitted to make restitution claims on [FENAFUTG's]

behalf."  (Dkt. 1213, at 2.)  The Court disagrees.

Defendant's argument ignores the fact that the MVRA, as interpreted by the Second

Circuit, makes restitution to all victims *mandatory*, whether or not a victim actually participates in

restitution proceedings.  *See United States v. Johnson*, 378 F.3d 230, 244 (2d Cir. 2004) ("[A]

district court may—indeed, must—impose orders of restitution on defendants convicted of crimes

identified in the MVRA even if their victims decline restitution.").  *But see United States v.

Speakman*, 594 F.3d 1165, 1177 (10th Cir. 2010) ("[T]he MVRA is expressly made subject to the

victim accepting restitution.").  The fact that FENAFUTG has not opted to file, or cannot file,[4] its

own request for restitution has no bearing on this Court's obligation to "order restitution to each

victim in the full amount of each victim's losses."  18 U.S.C. § 3664(f)(1)(A); *see also* 18 U.S.C.

§ 3663(A)(d) ("An order of restitution under this section shall be issued and enforced in accordance

---

[4] In connection with the sentencing of Defendant Hector Trujillo, CONCACAF explained that FENAFUTG had been suspended and asked at that time that CONCACAF be permitted to hold any restitution awarded to FENAFUTG in escrow until the suspension is lifted.  At that time, the Court held that any funds awarded to FENAFUTG would instead be held in the Clerk's Office escrow account.  (Dkt. 877 at 3–4.)

with [18 U.S.C. §] 3664); 18 U.S.C. § 3664(g)(1) ("No victim shall be required to participate in any phase of a restitution order."); *Johnson*, 378 F.3d at 245 ("[D]efendants' victims may not veto the obligation of the District Court to impose orders of restitution.").[5]   Accordingly, the Court finds Defendant's argument meritless and considers whether the bribes promised to Defendant may serve as a measure of FENAFUTG's losses.

**B.        Correlation Between the Promised Bribes and FENAFUTG's Losses**

Defendant also objects on the merits to CONCACAF's request for restitution on behalf of FENAFUTG, arguing that CONCACAF's use of the $20,000 in bribes promised to Defendant as a proxy measure of FENAFUTG's losses is impermissible.  (Dkt. 1213, at 2.)  According to CONCACAF and the government, the agreement by Tordin and his co-conspirator to pay $20,000 to Defendant *in addition to* the officially negotiated contract with FENAFUTG demonstrates that the contracts were worth at least $20,000 more to Tordin and his co-conspirator than they ultimately paid to FENAFUTG.  (*See* Dkt. 1207, at 2; Dkt. 1212, at 2; Dkt. 1221, at 2.)  It follows then, they contend, that in an honest transaction resulting in a "clean contract," Tordin and his co-conspirator would have paid the additional $20,000 amount to FENAFUTG, such that the promised bribes are a sound measure of the minimum amount of FENAFUTG's lost revenue. (Dkt. 1207, at 2 ("$20,000 is an appropriate *minimum* measure of the loss that FENAFUTG suffered as a result of Jiménez's offense" (emphasis added)); Dkt. 1212, at 2 ("FENAFUTG suffered _at least_ $20,000 in lost revenue from Jiménez's misconduct." (emphasis added)).) Because there is no material difference between this argument and the one previously rejected by the Court in connection with the sentencings of Jiménez's co-Defendants, the Court finds that the

---

[5]  Even if the Court were inclined to follow the Tenth Circuit's holding in *Speakman*, 594 F.3d at 1177, there is no indication here that FENAFUTG is unwilling to accept any restitution award the Court might impose in its favor.

government and CONCACAF have failed to establish, by a preponderance, a direct correlation between the bribe amount promised to Jiménez and the amount of FENAFUTG's lost revenue.

As the Court stated in its previous restitution orders, "a sentencing court ordering restitution under the MVRA may not substitute a defendant's ill-gotten gains for the victim's actual loss." *United States v. Zangari*, 677 F.3d 86, 93 (2d Cir. 2012); (*see also* Marin & Napout Order, Dkt. 1084, at 19 (quoting *Zangari*).).  Nevertheless, "where there is a direct correlation between [the defendant's] gain and [the victim's] loss," kickbacks to a defendant "can act as a *measure* of . . . the victim's loss." *Id.*  Thus, where "*every dollar gained* by the defendant *was necessarily lost* by [the] victim[]," a court may award restitution equal to the amount of the defendant's gain. *United States v. Finazzo*, 850 F.3d 94, 118 (2d Cir. 2017) (emphasis added).

Contrary to CONCACAF's and the government's arguments, it is far from clear that a $20,000 loss to FENAFUTG is the "necessary consequence" of "every dollar" promised to Defendant.  *See id.*  The entire amount of the bribes offered by Tordin and his co-conspirator to Defendant is not *necessarily* drawn from an underpriced contract.  Rather, some or all of the $5,000 promised for each Friendly Match could have been intended as compensation to Defendant for defraying transaction costs that Tordin and his co-conspirator would normally have incurred in negotiating contracts for a Friendly Match—*e.g*., fees paid to lawyers and consultants to help induce a soccer association to participate in a friendly match through an honest, arms-length transaction.[6]  The fees paid to these agents, though external to the contract, represent transaction

---

[6] Transaction costs are "expenditures involved in searching for prices, searching for trading partners, and contract[-]negotiation and contract-enforcement costs."  Janet T. Landa, Hadley v. Baxendale *and the Expansion of the Middleman Economy*, 16 J. Legal Stud. 455, 462 (1987).  Transaction costs may impact the amount that a negotiating party is willing to pay within a contract.  *See Kirtsaeng v. John Wiley & Sons, Inc.*, 568 U.S. 519, 585 n.26 (2013) (Ginsburg, J., dissenting) (recognizing that if "transactions costs . . . rise, consumers' perception of a [product's] value, and thus the price they are willing to pay for such a [product], might fall").

costs that may positively or negatively affect the price a party is willing to pay within a contract. *See* David M. Driesen & Shubha Ghosh, *The Functions of Transaction Costs: Rethinking Transaction Cost Minimization in a World of Friction*, 47 Ariz. L. Rev. 61, 63–64 (2005) (arguing that while some transaction costs function as "deadweight losses," others may "help avoid inefficient transactions, bring about otherwise impossible efficient transactions, or help improve the equity of transactions").  Here, the bribe amount offered to Jiménez may represent additional value that Tordin and his co-conspirator placed on each of the Friendly Matches, but that fact does not establish that this additional value *necessarily* would have flowed to FENAFUTG if the contracts had been agreed upon through an honest transaction.  Like the fees paid to lawyers to negotiate a fair contract, the bribes offered or paid to Jiménez may simply represent Jiménez's value to the bribers as someone who could secure FENAFUTG's acceptance of a *non-depressed* price for a Friendly Match with minimal negotiation and risk.[7]  Alternatively, they may represent the value Tordin and his co-conspirator placed on ensuring an ongoing relationship with Jiménez in connection with future matches or tournaments, given Jiménez's position as FENAFUTG's president.  Indeed, given the corruption endemic to the soccer world, the bribes paid to soccer officials could readily be viewed, and presumably did at times function, as transaction fees or costs simply to obtain a contract at a non-depressed price, or could have served as compensation for

---

[7] This same logic underpins the Second Circuit's decision in *Finazzo* overturning a district court's award of restitution based on the amount of a kickback paid to the victim's agent:

> A portion of Finazzo's worth to South Bay may, therefore, simply derive from steering additional business to South Bay at a *non-inflated* price.  Similarly, Finazzo's conduct may have reduced transactions costs for South Bay.  These factors could increase Finazzo's worth to Dey[, a South Bay executive,] and therefore make the kickback scheme profitable for Dey, without inflicting pecuniary loss on Aéropostale.

*Finazzo*, 850 F.3d at 118 (emphasis in original).

information about the non-depressed price at which a soccer organization would agree to contract for a match or tournament.   While these alternatives may seem speculative, so too is the government's and CONCACAF's theory that the $20,000 represents the additional amount Tordin and his co-conspirator would have been willing to pay as part of the contract itself; here, there simply has not been enough evidence put forth to show what Tordin and his co-conspirator would have paid for a clean contract or what the actual value of that contract was.

At the April 4, 2019 oral argument on restitution, the government sought to distinguish the bribery scenario presented in *Finazzo* from the one presented here, respectively: (1) a windfall[8] scenario, where a payee offered a kickback to a payor's agent to induce the bribed agent to cause the payor to make an *above*-fair-market-value offer to the payee;[9] and (2) a discount scenario, where the payors (Tordin and his co-conspirator) offered and paid a bribe to the payee's agent (Jiménez for FENAFUTG) to induce the bribed agent (Jiménez) to cause the payee (FENAFUTG) to enter into contracts for Friendly Matches at allegedly *below*-market prices.  With respect to the first scenario (from *Finazzo*), the government acknowledges that the bribe amount is an unreliable measure of loss because the bribed agent could have been compensated solely out of the payee's corrupt profits, but he also could have been compensated out of profits that the payee would have obtained through an honest transaction.   With respect to the second scenario, which the government and CONCACAF argue exists in this case, the government maintains that there is only one way to read the facts, namely, that the entire amount paid by the payors (Tordin and his co-

---

[8] The terms "discount" and "windfall" are the Court's, not the government's.

[9] In *Finazzo*, South Bay (the payee) was a clothing supplier that paid kickbacks to Finazzo (the bribed agent), a senior executive at the clothing retailer Aéropostale (the payor), in order to induce Aéropostale to purchase South Bay's goods at an allegedly inflated price.  850 F.3d at 98–103.

conspirator) should have been paid within the contract, or alternatively stated, that the corrupt bribe *must* have been taken out of the fair market value of the contract.  (*See* Dkt. 1212, at 2.)

While the government may be correct that a bribe is a more reliable measure of a victim's loss in the discount scenario than in the windfall scenario, that distinction does not relieve the government of its burden to prove by a preponderance that the amount of the promised bribes is, dollar-for-dollar, directly correlated with the victim's losses. *Finazzo*, 850 F.3d at 118.  Regardless of the differences in the mechanics of the two bribery schemes—windfall versus discount—the problem with the government's and CONCACAF's arguments is that they do not demonstrate that the bribes promised or paid to Jiménez came out of the contract price that would have been offered to FENAFUTG in a clean contract.  CONCACAF and the government have not sufficiently ruled out the plausible inference that the bribe amounts offered to Jiménez represented amounts that Tordin and his co-conspirator anticipated paying *above* the fair market value of the contract—*e.g.*, payments to facilitate the negotiation of an honest contract or to induce a long-term relationship with Jiménez—rather than a direct discount taken out of the fair market value of the contract for each Friendly Match that Defendant negotiated.  The government and CONCACAF have failed to show that the bribe amount is money that would have gone to FENAFUTG absent the bribery scheme, *i.e.*, that "*every dollar gained* by [Jiménez] *was necessarily lost* by [FENAFUTG]." *Finazzo*, 850 F.3d at 118 (emphasis added).  Accordingly, the Court finds that FENAFUTG is not entitled to restitution in the amount of the promised bribes.[10]

---

[10] In light of this ruling, the Court does not address the argument that FENAFUTG would be entitled to the full amount of the promised bribes, even though Jiménez received only $5,000.

**IV.     Defendant's Constitutional Objections**

As a final backstop, Jiménez argues that the imposition of any restitution amount "not found by a jury beyond a reasonable doubt . . . violates [his] rights under the Sixth and Seventh Amendments."  (Dkt. 1213, at 7.)  However, the Second Circuit has repeatedly held that "there is no constitutional requirement that the facts needed for [a] district court's fashioning of a restitution order be found by a jury or found beyond a reasonable doubt."  *United States v. Reifler*, 446 F.3d 65, 116 (2d Cir. 2006); *see also United States v. Boccagna*, 450 F.3d 107, 108–09 (2d Cir. 2006) ("*Reifler* holds that judicial factfinding relevant to an MVRA restitution order does not implicate Sixth Amendment rights."); *United States v. Tin Yat Chin*, 476 F.3d 144, 147 (2d Cir. 2007) (finding that a defendant's argument that a district court's determination of restitution under the MVRA violated his alleged constitutional right to have that determination made by a jury was foreclosed by *Reifler*); *cf. Hester v. United States*, 139 S. Ct. 509, 509–11 (Jan. 7, 2019) (Gorsuch, J., dissenting from the denial of *certiorari*) (arguing that the Court should decide whether the Sixth and Seventh Amendments require a jury to find facts necessary to support a restitution order). Because Second Circuit precedent forecloses Defendant's argument, the Court finds no violation of a constitutional right in awarding restitution to CONCACAF.

## CONCLUSION

For the reasons stated herein, the government's motion for restitution is granted in part and denied in part.  The Court awards restitution to CONCACAF in the amount of $1,517,884.70, with Defendant Jiménez to be jointly and severally liable with Defendants Marin, Napout, Li, and Salguero and any other convicted co-conspirators.  Defendant shall make payments on his restitution obligations according to the following schedule:

§   November 20, 2019: 10% of gross income, if any, received from the date of the restitution order;

11

§   May 20, 2020 and every six months thereafter: 10% of gross income, if any, received since the previous payment date.[11]

Once Defendant's restitution obligations have been satisfied, he will continue to make payments on the same schedule until his previously ordered forfeiture obligation[12] has been satisfied.  As proposed by the government, "in advance of each payment date, the government, . . . [D]efendants [including Jiménez], and the victims [shall] advise the Court, as warranted, of any reductions in the outstanding restitution amounts owed to the victims due to [the] restoration of forfeited funds or recovery of losses from other sources."  (Dkt. 1234, at 2.)

SO ORDERED.

*/s/ Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated:  April 19, 2019
        Brooklyn, New York

---

[11] On April 12, 2019, the government and Jiménez jointly submitted this payment schedule, which the Court has adopted.  (Dkt. 1234.)  However, the Court has not adopted Jiménez's proposal to allow for half of each of his 10%-of-gross-income payments to be allocated to restitution and half to forfeiture.  Jiménez will make restitution payments until the full amount of restitution is paid by Jiménez and his convicted co-conspirators, and only then resume making his forfeiture payments.

[12] On February 8, 2019, the Court issued an Amended Preliminary Order of Forfeiture requiring Jiménez to pay a forfeiture money judgment of $350,000, of which $50,000 was due one month after his guilty plea and another $50,000 that was due eighteen months after his guilty plea. (Dkt. 1195, ¶ 2.)  To the extent that Jiménez has not made the second $50,000 forfeiture payment, this Order modifies that requirement to allow Jiménez to suspend his forfeiture payments until after he has fulfilled his restitution obligations and to then begin paying forfeiture based on the schedule set forth herein.